UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ISRAEL ACADEMY OF SCIENCES
AND HUMANITIES,

                Plaintiff,

– against –

AMERICAN FOUNDATION FOR
BASIC RESEARCH IN ISRAEL, INC.,

                Defendant.

**OPINION & ORDER**

22-cv-4810 (ER)

RAMOS, D.J.:

    The Israel Academy of Sciences and Humanities ("the Academy") is an academic body that advances scholarship and scientific research in Israel. It brings this action against the American Foundation for Basic Research in Israel, Inc. ("the Foundation"), a New York charitable non-profit, to compel the Foundation to turn over charitable donations it allegedly received for the Academy's benefit but which it has wrongfully withheld.

    Before the Court is Defendant's motion to dismiss for lack of standing and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, Defendant's motion is GRANTED.

**I.    FACTUAL BACKGROUND**

    **A. The Academy and Israel's Research Crisis**

    Established in 1961 by the State of Israel for the advancement of scholarship and scientific research in Israel,[1] the Academy is a prestigious academic body of Israel's leading scientists in the sciences and humanities. FAC ¶ 30. Scholars of the Academy not only promote research but also advise the government on its activities and represent

---

[1] The Academy was established pursuant the Israel Academy of Sciences and Humanities Law. Doc. 25 (First Am. Compl. ("FAC")) ¶ 30.

Israel at international institutions and conferences. *Id.* ¶ 30. The Academy has the statutory authority to direct funds to scientific projects and scientists in Israel. *Id.* ¶ 2.

In the 1980's, government budget cuts in Israel left its institutions of higher learning with little or no funding sources, creating a crisis for scientific research there. *Id.* ¶ 35. In April 1985, then-Prime Minister, Shimon Peres, approached the Academy to request it create a plan for the funding and advancement of basic research in Israel. *Id.* ¶ 36. In response to the Prime Minister's request, the Academy created a committee to consider ways in which it could identify sources to fund Israeli research.[2] *Id.* ¶ 37. The committee concluded that a substantial expansion was needed to finance research, and it proposed that the Israeli Government create a body dedicated to funding in the hopes of reaching donors from across the Jewish diaspora. *Id.* ¶ 38. Accordingly, the Academy decided to establish a public, nonprofit corporation in New York. *Id.* ¶ 39.

### B. The Foundation and its Purpose

On July 12, 1990, the Academy created the Foundation in New York. *See id.* ¶ 4. The Academy maintains that the sole purpose of the Foundation was to "receiv[e] donations in the United States procured or provided by [the Academy] and then us[e] the donations received through [the Foundation] to fund grants for the advancement of basic scientific research in Israel in accordance with the goals set by [the Academy] and the instructions of the donors." *Id.* The Foundation's formation documents state it operates for the advancement of basic science in Israel generally. *See, e.g.*, Doc. 31-2 (the Foundation's certificate of incorporation), Doc. 32-1 (the Foundation's bylaws). In other words, the documents represent that the Foundation was not created to specifically benefit the Academy. In fact, the Foundation's bylaws even prohibit earmarking by donors and state that the Foundation "shall not accept any contribution which requires that [it]

---

[2] The committee was headed by its then-President, Professor Joshua Jortner. *Id.* ¶ 37. Its other members included Dr. Meir Zadok, then-Director General of the Academy and Professors Israel Dostrovski, Jacob Ziv, Shimon Amitzur, and Natan Rotenstreich. *Id.*

2

contribute or transmit such contribution solely to any named organization." Doc. 32-1 at 24. But the Academy alleges that the omission of reference to the Academy was done purely to preserve the tax-exempt status of donations to the Foundation and did *not* signify that the Foundation would not act for the Academy's benefit. *Id.* ¶ 40.

Indeed, to ensure the Foundation carried out its charitable mandate for the Academy's benefit, the Academy named three of its officers to the Foundation's Board of Directors ("the Board"). *Id.* ¶ 41. Those officers included: Prof. Joshua Jortner, the president of the Academy from 1986 to 1995; Dr. Meir Zadok, the director general of the Academy from 1987 to 2016; and Professor Alex Keynan, a special advisor to the president of the Academy from 1991 until 2012. *Id.* ¶¶ 8, 41. According to the Academy, the Board's sole function since 1992 has been to evaluate and approve the funding of the research grants that the Academy submits annually. *Id.* ¶ 7.

Further, on September 17, 1991, the Foundation passed a corporate resolution that would name the Academy as an authorized signatory and a trustee of the Foundation's bank accounts. *Id.* ¶ 78. The Academy also provided the Foundation "bookkeeping services, bureaucratic services and financing of day to day activities" through its Chief Financial Officer, who also drafted the Foundation's investment policy, supervised the external accountants, provided auditing services, and signed documents to verify the accuracy of the Foundation's financial activities. *Id.* ¶¶ 82–83. The Academy alleges that the Academy's financial entanglements with the Foundation evidence "the parties' recognition that the funds donated to [the Foundation] were meant to be used exclusively to fulfill the goals set by [the Academy] and the donors for the advancement of science in Israel." *Id.* ¶ 84.

### C. Soliciting Donations for the Foundation

The Foundation commenced operations on July 23, 1991, and for nearly two decades, the Academy solicited and obtained donations for the Foundation. *Id.* ¶ 4. Donors were explicitly informed, in writing, that the Foundation was a nonprofit

3

organization founded for the sole purpose of receiving donations for the Academy's research activities in Israel. *Id.* ¶ 42. In other words, donors were made aware that the Foundation was an arm of the Academy, and it was merely separate for tax reasons. *Id.* Indeed, Zadok even wrote to donors, on the Academy's letterhead, that the Foundation did not engage in public fundraising but rather was designed to transfer funds given by U.S. donors to the Academy by way of grants. *Id.* ¶¶ 42, 44–45. For example, in 1993, Jortner wrote to Dr. Laszlo Tauber, a donor of a large endowment, that "[t]he American Foundation for Basic Research in Israel, an American non-profit organization[,] was established in the U.S. especially for the purpose of receiving contributions there for the activities of [the] Academy." *Id.* ¶ 44. Again, on November 21, 1995, Jortner wrote to a member of the Board that the Foundation "was formed to enable us to receive US donation[s] for the Academy." *Id.* ¶ 45.

On the basis of these representations, various donors made donations to the Foundation for the Academy's benefit. *Id.* ¶ 43. Particularly relevant here, between 1991 and 1995, the Academy directed four large charitable endowment funds to the Foundation: the Revson Fund, the Tauber Fund, the Recanati Fund, and the Rothschild Fund (together, "the Four Funds"). *See id.* ¶¶ 13, 56–77.

*1. The Revson Fund*

On June 22, 1987, before the Foundation's creation, the Charles H. Revson Foundation, Inc. ("Revson Foundation") pledged its intention to donate $5 million in five years to the Academy or the Israel Science Foundation, which was affiliated with the Academy. *Id.* ¶¶ 56–57. While the Revson Foundation initially began making its annual installment payments directly to the Academy, by 1991 it began making installment payments to the Foundation at the Academy's direction. *Id.* ¶ 58.

Moreover, in its agreement with the Academy, the Revson Foundation explicitly stated the endowment's intended purpose was "to enable the Israel Academy of Sciences to continue funding several research projects for an additional year." *Id.* ¶ 60. It further

4

stated that the Academy was the grantee, although the Foundation was the payee, and the Academy agreed "[n]ot to use any of the grant funds . . . to make any grants to individuals or to other organizations, except for the payment of stipends to fellows or honoraria or expenses of consultants." *Id.*

### 2. The Tauber Fund

In 1993, Dr. Laszlo Tauber committed to donate $500,000 to support the Academy's research in Israel for the life sciences. *Id.* ¶ 62. In a letter dated February 28, 1994, Jortner wrote to the Tauber family, "we have received notice from the office of the Israel Bonds in the US confirming that you have purchased [$250,000] in Israel bonds in the name of the Israel Academy of Sciences and Humanities and transferred them to the American Foundation for Basic Research in Israel which is [a] charitable trust, which receives and manages funds for the Israel Academy." *Id.* ¶ 65. The following year, on September 22, 1995, Dr. Tauber confirmed, "I ha[ve] made a provision for the Israel Academy of Sciences and Humanities in the amount of $50[0],000 in my Charitable Remainder Trust."[3] *Id.* ¶ 64 (alterations in original). After the funds were transferred to the Academy, it transferred the funds to the Israel Science Foundation to fund one of its awards, the "George Klein prizes." *Id.* ¶ 67.

### 3. The Recanati Fund

In 1991, the family of Leon Recanati set up a foundation for research grants in the areas of science, medicine, and technology. *Id.* ¶ 68. With their company in Israel, IDB Holdings Company, Ltd. ("IDB"), they agreed to donate $1 million to the Academy. *Id.* In a written agreement with the Academy, the Recanati family stated that, "[u]nder the auspices of the Israel Academy of Sciences and Humanities, the Recanati Family in

---

[3] The Court notes that this alteration—from $50,000 to $50[0],000—comes from the FAC. *See* FAC ¶ 64. However, Dr. Tauber's letter, which was appended as Exhibit C to the Declaration of Galia Finzi, states the amount was $50,000. Doc. 43-3 at 12. Additionally, "Schedule A" of the Dr. Tauber's Charitable Remainder Unitrust states that "Proportionate Interest in Promissory Note" was made in the amount of 50,000 to the American Foundation for Basic Research in Israel. *See id.* at 11. Neither party addresses this discrepancy.

5

cooperation with [IDB] will donate $1 million over a 10 year period for the advancement of scientific research." *Id.* ¶ 69. And at the Academy's direction, the donations were paid to the Foundation. *Id.* ¶ 70.

### 4. The Rothschild Fund

On May 7, 1990, the Baroness Batsheva de Rothschild confirmed to Jortner her intention to transfer to the Academy the assets held by the B. de Rothschild Foundation for the Advancement of Science in Israel, Inc., and the Batsheva de Rothschild Fund for Science and Technology. *Id.* ¶ 71. The terms of the transfer are expressed in a written agreement that confirms the Academy be transferred to the Foundation, and over time the Academy would award the funds to designated recipients. *Id.* ¶ 73.

### D. Funding After 1995

In approximately 1995, the Academy discontinued regular fundraising for the Foundation but continued soliciting small donations to maintain the Foundation's status as a public charity. *Id.* ¶ 12. The Academy maintains that, after 1995, the Foundation largely acted as a caretaker or umbrella organization for the charitable contributions that were previously procured or provided by the Academy. *Id.* And in 2009, the Foundation was converted from a public charity to a private foundation. *Id.*

### E. The Dispute

Beginning in 2016, disputes arose between the Academy and the Foundation over the termination of the Academy's director general and alleged attempts by the Foundation to divert funds from the Academy. *See id.* ¶¶ 17, 101–07. As a result of the disputes, the Foundation removed the Academy as a signatory on the Foundation's bank accounts in 2020, allegedly, to constrain the Academy's ability to enforce the charitable mandate. *See id.* ¶¶ 80, 97, 105. Further, beginning in 2021, the Foundation abruptly denied the Academy access to its books and records. *Id.* ¶ 22. By doing so, the Academy claims it became impossible for it to verify whether funds were improperly being withheld and used. *Id.*

Moreover, in May 2021, the Foundation denied the Academy's grant application for 2022. *Id.* ¶ 23. Jortner informed the Academy that the Board had decided it would no longer approve or fund the Academy's grant applications. *Id.* The Academy claims that the Foundation has refused to fund scholarships and post-doctoral work in Israel previously approved and in progress. *Id.* ¶ 23. Accordingly, the Academy's grant applications incurred a tax penalty for not distributing a minimum amount of the corporation's income.[4] *Id.* ¶ 24.

The Foundation's sole purported justification for refusing to fund the Academy's activities was a letter from the Academy's attorney on August 11, 2021[5] that raised concerns about the Foundation's conduct. *Id.* ¶ 24. As a result of the parties' dispute, the Academy argues it struggles to support various charitable activities that it sponsors, including joint programs between with the U.S. National Academy of Sciences and the Kavli Foundation for scientific research. *Id.* ¶ 28.

On March 11, 2022, Jortner reiterated that he would no longer allow the Foundation to work with the Academy on charitable grants for the advancement of science in Israel, but instead would make all decisions himself regarding the allocation of the remaining donations in the Foundation's possession. *Id.* ¶ 27.

II.   **PROCEDURAL HISTORY**

The Academy filed the instant action on June 8, 2022. Doc. 1. The Foundation moved to dismiss on August 4, 2022 (Doc. 14), and the Court granted the Academy leave to amend on August 8, 2022 (Doc. 20).

The Academy filed its FAC on August 25, 2023, bringing claims for declaratory judgment, accounting, imposition of a constructive trust, breach of implied contract, breach of a fiduciary duty, conversion, and unjust enrichment. Doc. 25. The Foundation

---

[4] It is unclear from the FAC if the tax penalty was issued against the Academy or the Foundation.

[5] The Academy does not clarify as to how the August 2021 letter allegedly precipitated the Foundation's May 2021 action.

filed the instant motion to dismiss the FAC on September 30, 2022, arguing that the Academy lacked standing and had failed to state a claim as to any of its causes of action. Docs. 30, 33.

## III. LEGAL STANDARDS

Although the Foundation only purported to move to dismiss under Rule 12(b)(6), the Court's consideration of a motion to dismiss for lack of standing is properly considered under Rule 12(b)(1). *See generally, e.g., Gonzalez v. Inn on the Hudson LLC*, No. 20 Civ. 9196 (ER), 2022 WL 974384 (S.D.N.Y. Mar. 30, 2022) (evaluating a motion to dismiss for lack of standing under Fed. R. Civ. Pro. 12(b)(1)). Moreover, where a party raises arguments for dismissal under both Rule 12(b)(1) and 12(b)(6), the Court must consider the Rule 12(b)(1) jurisdictional arguments first because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Chambers v. Wright*, No. 05-cv-9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (citations omitted); *see also Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012).

### A. Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). When determining if a federal court has subject matter jurisdiction and standing is challenged on the basis of the pleadings, the Court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [the plaintiff]." *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (citation omitted). However, the burden remains on the plaintiff, as the party invoking federal jurisdiction, to establish its standing as the proper party to bring this

action. *See Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record . . . [and the plaintiff must] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." (internal citations and quotation marks omitted)). Further, "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration in original) (citation omitted).

### B. Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule

9

of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[ ] and documents incorporated by reference in the complaint."  *Doe v. N.Y. Univ.*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## IV.   DISCUSSION

### A.  Rule 12(b)(1):  Standing

The Academy alleges it has standing as either (1) a beneficiary of the Foundation with a special interest in its funds, (2) a donor to the Foundation, or (3) a co-trustee.  The Foundation disputes that the Academy has standing under any theory.  The Court holds that the Academy lacks standing.

#### 1. *The Academy Does Not Have Standing Based on a "Special Interest" in Funds Held by the Foundation*

The Foundation argues that the Academy lacks standing to maintain this action because beneficiaries may only challenge actions by trustees of a charitable trust if a "special interest" exception applies, but no such exception applies here.[6]  Doc. 33 at 15. The Academy, however, asserts that it has a special interest because it "has been the sole beneficiary of [the Foundation's] charitable grants."  Doc. 42 at 13.  It claims that the

---

[6] The Academy argues that the Foundation should be estopped from challenging the Academy's standing on the basis that such an argument is inconsistent with the Foundation's past actions and statements.  Doc. 42 at 14–16.  But, even if the Academy was correct that the Foundation could not itself properly raise such an argument, "[b]ecause the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."  *Plante v. Dake*, 621 F. App'x 67, 69 (2d Cir. 2015).  Accordingly, the Court need not decide whether the Foundation is estopped.

Four Funds were transferred to the Foundation on the express condition that they be used to enable the Academy's research in Israel, as evidenced in the gift agreements. *Id.*

Under New York law, the general rule is that "one who is merely a possible beneficiary of a charitable trust, or a member of a class of possible beneficiaries, is not entitled to sue for enforcement of the trust." *Alco Gravure, Inc. v. Knapp Found.*, 479 N.E.2d 752, 755 (N.Y. 1985); *see also* N.Y. Est. Powers & Trusts Law ("EPTL") § 8-1.1(f) ("The attorney general shall represent the beneficiaries . . . and it shall be his duty to enforce the rights of such beneficiaries . . . in the courts."). The purpose of this rule is to "prevent vexatious litigation and suits by irresponsible parties who do not have a tangible stake in the matter." *Alco Gravure*, 479 N.E.2d at 756. An exception, however, exists "when a particular group of people has a special interest in funds held for a charitable purpose, as when they are entitled to a preference in the distribution of such funds and the class of potential beneficiaries is sharply defined and limited in number." *Id.* at 755 (citation omitted).

To determine whether the "special interest" exception applies, courts "look[] to the trust's chartering documents to discern the purpose of the trust, and whether there is a class of intended beneficiaries" that satisfies the exception. *Sagtikos Manor Historical Soc'y, Inc. v. Robert David Lion Gardiner Found., Inc.*, 9 N.Y.S.3d 80, 82 (N.Y. App. Div. 2d Dep't 2015). Indeed, this District has expressly held that courts may consider *only* the chartering documents to determine whether the special interest applies, not gift agreements or wills by which funds were donated to a trust. *Hadassah Acad. Coll. v. Hadassah*, No. 18-cv-2446 (AT), 2019 U.S. Dist. LEXIS 71885, at *9–11 (S.D.N.Y. Apr. 29, 2019), *aff'd* 795 F. App'x 1 (2d Cir. 2020) (summary order). In *Hadassah*, the plaintiff beneficiary moved to reconsider the Court's prior decision that, based on the trust's chartering documents, the plaintiff lacked "special interest" standing; on reconsideration, the plaintiff specifically argued that the court had erred in not considering the wills, deeds, and gift instruments and agreements. *Id.* at *9. The

11

*Hadassah* court held, however, that plaintiff's argument "rest[ed] on a misreading of the caselaw," as neither *Alco Gravure* nor *Sagtikos Manor* permitted the court to look beyond the trust's governing documents to determine whether the special exception applies. *Id.* at *9–13.  On appeal, the Second Circuit did not need to address the plaintiff's argument that courts may look beyond a trust's chartering documents because it found that doing so would not change the result in *Hadassah*, as even the gift agreements and wills to which the plaintiff pointed left the trust "complete discretion in the disposition of the funds notwithstanding the expressed wishes of the donor."  795 F. App'x at 3.

Here, neither the Foundation's certificate of incorporation (Doc. 31-2) nor the bylaws (Doc. 32-1) explicitly name the Academy as a beneficiary nor otherwise reference the Academy.  To the contrary, the bylaws explicitly prohibit earmarking and state that the Foundation "shall not accept any contribution which requires that [it] contribute or transmit such contribution solely to any named organization."  Doc. 32-1 at 24.  Moreover, the Court will not look to the gift agreements for the Four Funds, as the Academy's invitation to do so is premised on the same misreading of *Alco Gravure* and *Sagtikos Manor* that the *Hadassah* court already rejected.  *See* 2019 U.S. Dist. LEXIS 71885, at *9–13.  Although the Court is not strictly bound by the decision since the Second Circuit did not directly decide the issue, it is persuaded by the reasoning in *Hadassah* and its analysis of the controlling law.  Accordingly, the Academy cannot claim the benefit of the "special interest" exception and lacks standing to challenge the enforcement of the trust.  Rather, the Attorney General is the appropriate plaintiff to enforce the rights of beneficiaries such as the Academy.

  2.  *The Academy Does Not Have Standing as a Donor to the Foundation*

In the alternative, the Academy argues that it has standing as a donor, vis-à-vis the Four Funds, because "[i]t is black letter law that a donor of a charitable gift has standing to use the donation to enforce the terms of the gift," and EPTL § 8-1.1(f) is no bar to donor standing.  Doc. 42 at 16.  The Foundation responds that the Academy's allegations

12

and the gift agreements themselves do not state on their face that the Academy was a donor, nor an agent or representative of, or successor to, the donor.  Doc. 33 at 19; Doc. 48 at 9–11.

The Academy is correct that New York law "accord[s] standing to donors to enforce the terms of *their own* gifts concurrent with the Attorney General's standing to enforce such gifts on behalf of the beneficiaries thereof."  *Smithers v. St. Luke's-Roosevelt Hosp. Ctr.*, 723 N.Y.S.2d 426, 435–36 (N.Y. App. Div. 1st Dep't 2001) (emphasis added). But the Academy alleged in the FAC only that it requested the Four Funds to pay the funds intended for it to the Foundation for distribution.  *See* FAC ¶¶ 58 (the Academy "directed the installment payments [from the Revson Foundation] after [1991] to [the Foundation]"); ¶ 63 (the Academy's president "requested that the donation [from the Tauber Fund] to the Academy be paid to AFBRI"); ¶ 70 ("[a]t [the Academy's] direction, the donations [from the Recanati Fund] were paid to [the Foundation]"); ¶ 72 ("the Baroness de Rothschild . . . confirm[ed] that the assets held by [the Rothschild Fund] would be transferred to [the Foundation] at the request of the Academy").  In other words, the Four Funds were not the Academy's *own* gifts.  Rather, they were gifts the Academy solicited for its own benefit but that it directed the donors to pay to the Foundation for distribution.  Thus, to the extent that the Foundation's actions have vitiated the purpose of the donations made by the Four Funds, the *Four Funds*—not the Academy—are the appropriate plaintiffs to challenge, as donors, the Foundation's alleged malfeasance.  *See Smithers*, 723 N.Y.S.2d at 435–36.  Accordingly, the Academy lacks standing as a donor to enforce the terms of the Four Funds' gifts.

3. *The Academy Does Not Have Standing as a Co-Trustee of the Foundation*

Finally, the Academy alleges it "has standing because it is a charitable organization itself with the authority to act as a co-trustee of both the funds that were donated to it, as grantee, and paid at its direction to [the Foundation], as payee, as well as the other funds that were received and managed by [the Foundation]."  Doc. 42 at 18–19.

13

The Academy's sole citation in support of its argument is to *Lefkowitz v. Lebensfeld*, 417 N.Y.S.2d 715 (N.Y. App. Div. 1st Dep't 1979), for the proposition that EPTL § 8-1.1(f) is no bar to co-trustee standing.  Doc. 42 at 18–19.  But *Lefkowitz* merely held that the Attorney General lacks standing, on behalf of the ultimate beneficiaries of a charitable organization that was the donee of a gift of corporate stock, to compel the corporation to declare and pay dividends.  417 N.Y.S.2d at 716.  Accordingly, even if the Court were to accept that the Academy established that EPTL § 8-1.1(f) did not *bar* standing, the mere lack of a bar is insufficient for the Academy to establish that any legal authority exists upon which it affirmatively *does* have standing as a co-trustee.  *See Selevan*, 584 F.3d at 89 (noting that plaintiff bears the burden to establish standing).  Accordingly, the Academy has failed to establish that it has standing either as a beneficiary with a "special interest" in the funds, as a donor, or a co-trustee.

### B. Rule 12(b)(6):  Failure to State a Claim

Because the Academy lacks standing to raise the instant claims, the Court therefore lacks jurisdiction to reach the Foundation's arguments under Rule 12(b)(6), and the motion to dismiss is granted.

### V. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate the motion, Doc. 30, and close the case.

It is SO ORDERED.

Dated:   August 25, 2023
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.